UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **E-WATCH, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. 4:12-cv-1250 |
| **COBAN TECHNOLOGIES, INC.** | § | |
| | § | |
| *Defendant.* | | |

## MEMORANDUM OPINION AND ORDER

This patent case is before the Court for construction of disputed claim terms in United States Patents No. 7,197,228 ("the '228 Patent") and 7,428,368 ("the '368 Patent"). The owner of these patents, e-Watch, Inc., alleges that Coban Technologies ("Coban") has infringed the patents.[1] Coban asserts various affirmative defenses and counter-claims, essentially arguing that (1) it has not infringed on the patents at issue and (2) that the patents are invalid.[2] The case has been transferred to this Court by consent of the parties pursuant to 28 U.S.C. § 636(c). The Court has received briefing from both parties, held a *Markman* hearing, and now issues this construction of the disputed terms.

### I.    BACKGROUND

e-Watch develops software and hardware for professional surveillance systems, including digital video recording systems. e-Watch owns the '228 Patent and the '368 Patent.[3] The technology described in these patents relates to a "mobile DVR system" that

---

[1] Dkt. 25.
[2] Dkt. 26.
[3] Dkt 33, Exhibit 1.

is capable of "recording and transmitting high resolution still image and video signals."[4] The '368 Patent is a continuation of the '228 Patent—the two are based on the same application, and the specifications of the '368 Patent are identical to those of the '228 Patent.

Coban is a designer and manufacturer of in-car video recording systems. On April 19, 2012 e-Watch filed a patent infringement suit against Coban. e-Watch's pleadings allege that Coban has infringed the '228 Patent and '368 Patent.[5]

The parties have filed a Joint Claim Construction Chart and submitted extensive briefing on the disputed claim terms. Originally, the terms "remote controlled, marked," "control unit," "retrieve," "on the fly," "transmitter," "switching system," "transmission," and "capture" were disputed. However, the parties agreed, prior to the *Markman* hearing, on the construction of all terms except "remote controlled," "marked," "marks," and "marking."

## II.   GENERAL LEGAL STANDARDS FOR CLAIM CONSTRUCTION

The process of patenting an invention begins with filing a patent application. The patent application includes a "specification" that describes the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." *Markman v. Westview Instruments Inc.*, 517 U.S. 370, 379, 116 S.Ct. 1384 (1996) (citing 35 U.S.C. § 112). The patent document also includes one or more "claims," which "particularly poin[t] out and distinctly clai[m] the subject matter which

---

[4] Dkt. 33.
[5] Dkt. 4.

the applicant regards as his invention." *Id*. These claims define the invention and determine "precisely what it is that it patented." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'").

When a patent owner brings suit against an alleged infringer, the Court construes the patent as a matter of law to determine its scope and meaning. *See, e.g., Markman v.* 517 U.S. at 390 (1996). This process is known as "claim construction." *See, e.g., Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996). The purpose of a *Markman* hearing is to determine the construction of any disputed claim terms. *Id.*

Claim construction centers upon "the language of the claims themselves." *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1314, 1324. The words of a claim are generally given their "ordinary and customary meaning," which in this context is defined as the meaning "that a term would have to a person of ordinary skill in the art in question at the time of the intervention." *Phillips*, 415 F.3d at 1312-13 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). If the claims use separate terms, "each term is presumed to have a distinct meaning." *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 847 (Fed. Cir. 2006). Courts consider the context in which the terms are used and the differences among the claims. *Phillips*, 415 F.3d at 1314 ("[B]ecause claim terms are normally used consistently throughout the patent, the usage

3

of a term in one claim can often illuminate the meaning of the same term in other claims.)"

The "ordinary meaning" of a term is determined by reviewing intrinsic evidence—*i.e.*, "the entire patent, including the specification" as well as the patent's prosecution history. *Id.* at 1313; *see also Vitronics Corp.*, 90 F.3d at 1582 (Fed. Cir. 1996). Extrinsic evidence, such as technical dictionaries and treatises, is used only when absolutely necessary—such evidence is considered "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1318.

For some claim terms, the "ordinary meaning" of claim is readily apparent. *See, e.g.*, *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (trial court properly declined motion to construe "melting" as a matter of law, because "the meaning of 'melting' does not appear to have required construction or to depart from its ordinary meaning."). "[C]laim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. However, even if the terms involved are "ordinary" words, construction may still be needed if the ordinary meaning does not resolve the parties' dispute about the scope of the claim. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1352, 1361-62 (Fed. Cir. 2008).

In construing a disputed term, the patent's specification may be especially helpful—"the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315. An essential "purpose for examining the specification is to

4

determine if the patentee has limited the scope of the claims." *SciMed Life Sys., Inc., v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001).   If the specification sets out a special definition given to a claim term by the patentee, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.   When a feature or function is described as the essence of the invention or as the invention itself, "the claims are not entitled to a broader scope than that embodiment." *SciMed Life Sys.*, 242 F.3d at 1341; *see also Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) ("[T]he specification frequently describes an 'intraluminal graft' as 'the present invention' or 'this invention,' indicating an intent to limit the invention to intraluminal devices."); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (construing claim term to include "fuel filter" because "[o]n at least four occasions, the written description refers to the fuel filter as 'this invention' or 'the present invention'").

While claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims. *Phillips*, 415 F.3d at 1323.   "There is a fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims." *Retractable Techs., Inc. v. Becton, Dickinson, and Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (citing *Phillips*, 415 F.3d at 1323).   The court must "strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention." *Id.*

## III.   CONSTRUCTION OF DISPUTED CLAIM TERMS

The Court has carefully reviewed the patents at issue, including their claims, specifications, and prosecution history.   The Court also has considered dictionary definitions, counsels' argument presented in the *Markman* hearing, and governing case law.

The '228 and '368 Patents derive from the same parent application and have nearly identical specifications.  For ease of reference, the Court's following analysis will refer to the '228 Patent, but will apply equally to the '368 Patent.

### A. "Remote Controlled"

The parties first dispute the construction of the term "remote controlled."  The adjective "remote controlled" appears in the abstract and claims of the '228 patent, while the noun "remote control" is used in the specifications.  In the claim, the adjective "remote controlled" describes "a multifunction remote controlled recording/playback system for recording full motion video signals comprising a series of sequential 'still' frames. . . ."  The noun "remote control" appears several times in the specifications, including the following: "[O]ne important unique feature of the invention is the incorporation of a single, multifunction remote control unit for controlling all the recording, capture, transmission and playback functions at the fingertips of the pilot."[6] The specifications reiterate: "One of the most significant advantages of the subject invention is the inclusion of all function and operating controls in a single remote control

---

[6] '228 at 1:53.

6

unit easily accessed by the pilot in the cockpit."[7]  Elsewhere, the specifications state "It is also an object and feature of the subject invention to provide for a single, multifunction control unit for controlling all recording, selection and capturing, transmission and playback functions of the system."[8]

In its Opening Claim Construction Brief, e-Watch provides the following proposed construction of the term "remote controlled": "Using multifunction apparatus to engage, disengage or otherwise adjust the record, capture, transmission and playback functions of the system."[9]  Coban's proposed construction is "controlled by a single, multifunction control unit for controlling all the recording, capture, transmission and playback functions."

e-Watch argues for its construction, pointing out it does not use the word "controlled," thus avoiding a tautology.  Additionally, e-Watch contends that Coban's proposed construction improperly imports the limitations "single" and "all" from the specifications into the claims.  To support this latter argument, e-Watch contends that the "essence of the invention" is not a "single" control unit, but instead the invention is a system function that allows operators to control all of the basic functions of the system from a central location—"rather than, for example, . . . pushing one button on the video recorder component physically located under the seat, and pushing another button on the

---

[7] '228 at 3:20.
[8] '228 at 3:41.
[9] e-Watch submitted a different proposed construction in the Joint Statement.  The Joint Statement construction reads, "An apparatus separate from the recording/playback system that can engage, disengage or otherwise adjust the functions of the system."  e-Watch's briefing admits that it mistakenly defined the noun, "remote controlled unit,"  in the Joint Statement, rather than the adjective phrase "remote controlled."

camera situated near the rear view mirror." (Dkt. 32, pg. 14).   To that end, e-Watch argues that its system functions "'at the fingertips' of the operator" and offers an example in which the system could be controlled by a split ergonomic keyboard. (*Id*. at 15).   e-Watch contends that such an example is "not a *single* keyboard, but rather *multiple* keyboards," and demonstrates its understanding of "two control units within easy reach."[10]

Finally, e-Watch also argues that the claim does not limit the system to one remote control in which "every possible function of the system" would be accessible from the remote control.   e-Watch contends that Coban's definition improperly imports these words from the specification.

Coban responds by pointing out that the patented "invention" is consistently described in the specification as a "single multifunction remote."   For example, the specification repeatedly states that a "single multifunction remote" is an "important feature of the invention."   The specification also states that "it is also an object and feature of the subject invention to provide for a combination video, audio and data recording having a single remote control unit for controlling all of the functions from a single control unit."

---

[10] Dkt. 32 at 15 (emphasis in original).  However, this example is not entirely persuasive.  An ergonomically split keyboard cannot properly be considered two complete keyboards—it is more accurately described as a single, complete keyboard divided into two parts.  In fact, the illustration provided in e-Watch's briefing, each half of the ergonomic keyboard is united by a cord.  Even if the keyboards operated wirelessly, one half of a keyboard is still insufficient. Using only one half of a keyboard is as effective as playing a violin concerto with only half a violin.

Coban argues that, when the subject matter claimed is the only subject matter that is described and enabled in the specification, that is the invention itself, and not simply a "preferred" example of a broader invention that is not described and enabled. For this reason, it argues that "remote controlled" should be defined in the claim as it is in the specification, meaning "controlled by a single, multifunction control unit for controlling all the recording, capture, transmission, and playback functions." The Court agrees. *See, e.g., Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (noting, "repeated and definitive remarks in the written description could restrict a claim limitation to a particular structure.").

The specification is clear that a "single remote control" is the main embodiment, or essence, of this invention. *See Honeywell Int'l, Inc.*, 452 F.3d at 1318 (Fed. Cir. 2006). The specification in this case suggests that that the very character of the invention does not permit "remote controlled" to be defined in the broader terms proposed by e-Watch. Accordingly, the Court adopts Coban's construction: "controlled by a single, multifunction control unit for controlling all the recording, capture, transmission, and playback functions."

### B. "Marked," "Marks," and "Marking"

The Court next turns to the construction of "marked," "marks," and "marking." The '228 Patent claims a "marking signal generator, whereby specific, selected frames of the recorded full motion video signal may be marked, the system being adapted to select said frames by searching for the marks, for distribution of the recorded marked frames by the video switching system." The specifications further state that an "important feature

9

of the invention is the capability for 'marking,' the recorded medium for later selecting, and capturing selected skills."[11] The "marking" ability is distinguished from the system's ability to "capture" single images: the system "may be used to manually scroll through the recording one-by-one or automatically scroll through all of the selected, marked stills for sequential viewing/and or transmission."[12] Data signals, such as "cockpit audio and telemetry, GPS and other data signals" are specifically included as available for incorporation as "part of the marking function. For example, specific still frame images could be selected based on GPS data for capture and storage, as well as for transmission."[13] Further, "it is also an object and feature of the subject invention to permit marking of selected stills, bursts or sections of full motion image segments via operator controlled selection, or selection based on predefined criteria such as time sequencing, GPS data or other."[14]

e-Watch contends that the Court need not construe the disputed terms at all. Instead, e-Watch asserts that the words are entitled to their ordinary meaning. In response, Coban contends that e-Watch has limited the meaning of the terms in the patent document, particularly by putting the word into quotation marks in the specification, thus implying that the word had a special or unique meaning. The Court agrees that e-Watch has given the term a special meaning and that the specifications support the Court's efforts to construe the term as a matter of law.

--------------------------------------------------

[11] '228 at 3:15.
[12] '228 at 2:32.
[13] '228 at 1:53.
[14] '228 at 3:55.

e-Watch proposes that the term "mark" be construed as a noun to mean "an electronic signal synchronized with, or introduced into a stream of motion video data, to identify the location of data that is within the motion of video stream for the purpose of recalling the data." Coban responds that a proper construction would limit the adjective "marked" and the verb "marking" to selecting for playback "after the completion of a mission, or during a mission."

The Court accepts e-Watch's proposed construction because it avoids the extraneous limitations found in Coban's proposed definition. The limitations proposed by Coban are not supported by the plain language of the intrinsic evidence. Further, the patent prosecution history relied upon by Coban actually supports e-Watch's construction—the "marking" is not a creation of a table of contents, or a collection of images to be viewed later. Instead, as stated in e-Watch's proposed construction, the term is used in the claim and explained in the specifications to describe an insertion into a stream of data, in the manner of a bookmark or placeholder. The Court therefore, agrees with e-Watch's construction that "mark" should be construed as a noun describing "an electric signal synchronized with, or introduced into a stream of motion video data, to identify the location of data that is within the motion video stream."

## Conclusion

The Court accepts the parties' stipulations regarding the proper construction of the agreed terms in the Patent. The Court has considered the intrinsic evidence, including the prosecution history. Based on the evidence and the application of governing claim

construction principles, the Court construes the disputed terms of "remote controlled" and "mark" as set forth herein.

SIGNED at HOUSTON, TEXAS, this 22 day of July, 2013.


GEORGE C. HANKS, JR.
UNITED STATES MAGISTRATE JUDGE

12